UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

        -v-                         5:16-CR-264

CHRISTOPHER M. SWARTZ,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

HON. GRANT C. JAQUITH           TAMARA THOMSON, ESQ.
United States Attorney for the       Ass't United States Attorney
   Northern District of New York
100 South Clinton Street, P.O. Box 7198
Syracuse, NY 13261

UNITED STATES DEPARTMENT     JOHN N. KANE, JR., ESQ.
   OF JUSTICE - TAX DIVISION
Northern Criminal Enforcement Section
601 D Street NW, Room 7122
Washington, DC 20530

BARCLAY DAMON LLP           GABRIEL M. NUGENT, ESQ.
Attorneys for Defendant
Barclay Damon Tower
125 East Jefferson Street
Syracuse, NY 13202

HARRIS, BEACH LAW FIRM      LEE E. WOODARD, ESQ.
Attorneys for Defendant
333 West Washington Street, Suite 200
Syracuse, NY 13202

AKERMAN LLP               SCOTT M. KESSLER, ESQ.
Attorneys for Claimant Orienta
   Investors, LLC and Edward
   St. Onge
666 Fifth Avenue, 20th Floor
New York, NY 10103

GRANGER & ASSOCIATES LLC                           RAYMOND R. GRANGER, ESQ.
Attorneys for Claimant Change Capital
    Partners Fund I, LLC
40 Fulton Street, 23rd Floor
New York, NY 10038

PLATZER SWERGOLD LEVINE GOLDBERG          RICHARD ANTHONY LAFONT, ESQ.
    KATZ & JASLOW, LLP
Attorneys for Claimant Change Capital
    Partners Fund I, LLC
475 Park Avenue South, 18th Floor
New York, NY 10016

OFFICE OF EDWARD A. O'HARA, III                    EDWARD A. O'HARA, III, ESQ.
Attorneys for Claimant Swartz Family Trust
304 South Franklin Street
300 Crown Building
Syracuse, NY 13202

CONTINENTAL TRUST CORPORATION
    LIMITED
Claimant, Pro Se
12 Par-la-Ville Road
5th Floor, Richmond House
P.O. Box HM 646
Hamilton HM CX
Bermuda
441-405-8100

DAVID N. HURD
United States District Judge

## **TABLE  OF  CONTENTS**

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

II.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6

III.    LEGAL STANDARD.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

IV.     DISCUSSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

        A.      The Government's Omnibus Motion to Dismiss. . . . . . . . . . . . . . . . . . . . . . .    17

                1.      The Swartz Family Trust.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

                2.      Continental Trust. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

        B.      The Government's Motion for Interlocutory Sale.. . . . . . . . . . . . . . . . . . . . . .    23

        C.      Orienta's Motion for Injunctive Relief.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

V.      CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    28

<u>**MEMORANDUM–DECISION and ORDER**</u>

**I. <u>INTRODUCTION</u>**

This is the aftermath of a criminal prosecution for wire fraud and tax evasion brought by the United States of America (the "Government") against defendant Christopher Swartz ("Swartz" or "defendant"), an entrepreneur from Watertown, New York.

For at least a decade, Swartz leveraged his controlling interests in various companies to bilk lenders and investors out of millions of dollars while at the same time evading his obligations to the Internal Revenue Service ("IRS").  By the end of his run as a white collar criminal, defendant had netted over $19 million in ill-gotten gains and staved off roughly $5 million in personal and business taxes.

Swartz's shell game relied heavily on his ownership and control of Jreck Subs, a franchised chain of sandwich shops popular in Central and Northern New York.  Defendant abused the brand's reputation in service of his own goals, using it not only as bait to lure in new investment but also as a shield to ward off anyone who might be inclined to look more carefully into the underlying stability of his financial affairs.

On September 19, 2016, Swartz waived indictment for his crimes and, in accordance with an agreement reached with the Government, pleaded guilty to a two-count information that charged him with wire fraud in violation of 18 U.S.C. § 1343 and tax evasion in violation of 26 U.S.C. § 7201.  Defendant was later sentenced to 150 months' imprisonment and ordered to pay restitution of $21,041,249 to his wire fraud victims and $4,619,340 to the IRS.  *See United States v. Swartz*, 758 F. App'x 108 (2d Cir. 2018) (summary order).

As relevant here, Swartz also consented to the entry of an order under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) directing the forfeiture of "any and all

interests" he held in the Jreck Subs franchise, including the franchise rights, trademarks, and other brand-related intellectual property ("Jreck Subs" or the "Asset").  The Court entered a preliminary order of forfeiture ("POF") to that effect on September 23, 2016.[1]

Thereafter, four claimants filed petitions under 21 U.S.C. § 853(n) asserting an interest in the Asset:  Edward St. Onge and Orienta Investors, LLC ("Orienta") (Dkt. Nos. 43, 55, 83, 84, 103); Change Capital Partners Fund I, LLC ("Change Capital") (Dkt. Nos. 68, 81); the Swartz Family Trust (Dkt. Nos. 75, 80); and Continental Trust Corporation Limited ("Continental Trust") (Dkt. No. 86).

On September 26 and December 20, 2017, the Government moved under Federal Rule of Criminal Procedure ("Criminal Rule") 32.2(c)(1)(A) to dismiss all four petitions.  Dkt. Nos. 85, 106, 176, 177.  The Swartz Family Trust and Orienta opposed dismissal, Dkt. Nos. 89, 112, and in reply the Goverment withdrew its motion to dismiss Orienta's petition, Dkt. No. 117, but not its motion to dismiss the other petitions, Dkt. No. 159.  The Court also received full briefing on a request by Orienta for leave to supplement its petition.  Dkt. Nos. 103, 108, 111, 113, 115.

On May 9, 2018, Orienta and the Government filed an additional set of motions in their struggle for continued control over the Asset.  Orienta, for its part, requested injunctive relief related to the ongoing operation of the franchise.  Dkt. No. 119.  The Government, on the other hand, sought approval under Criminal Rule 32.2(b)(7) to conduct an interlocutory judicial sale.  Dkt. No. 120.  The Court permitted extensive briefing on these motions.  *See, e.g.*, Dkt. Nos. 130, 131, 132, 134, 135, 136, 137, 146, 148, 149, 150.

---

[1] An amended preliminary order added a money judgment for $12,535,400.  Dkt. No. 66.

On June 1, 2018, the Court heard oral argument on Orienta's motion for injunctive relief and the Government's motion for interlocutory sale.  Thereafter, the Court allowed supplemental briefing on these and other issues.  *See, e.g.*, Dkt. No. 143, 159, 163, 165, 166, 167, 168, 169.  Shortly thereafter, a group of franchisees moved to intervene, Dkt. No. 170, but then decided against it, Dkt. No. 172, and withdrew their request, Dkt. No. 173.

On January 16, 2019, the Government advised, and on July 25, the petitioner confirmed, that Change Capital's claim has been fully satisfied and therefore its § 853(n) petition is moot.  Dkt. No. 181, 185.  The remaining matters are now fully briefed and will be decided on the basis of the written submissions and the points of counsel heard at oral argument.

## II.  BACKGROUND[2]

The sprawling operation now known as Jreck Subs first sprung into existence in the summer of 1967, when three schoolteachers looking to make some extra money joined forces.  The trio purchased a decommissioned school bus and set up shop at the entrance to the local U.S. Army base, where they sold submarine sandwiches to the hungry soldiers stationed there.

It turned out to be a good business model, and the next summer the three original founders added two more friends to the mix.  Jreck Subs assumed the corporate form in

---

[2]  The basic background set out here is taken from a review of the entire record with particular reliance on the sentencing memoranda and transcripts, the Government's omnibus motion to dismiss, and the petitioners' filings in support of their claims.  Notably, however, because a motion to dismiss a third-party claimant's petition in an ancillary proceeding is analyzed like a 12(b) motion to dismiss, the specific factual allegations in each of the petitions will be assumed true for purposes of evaluating the Government's motion to dismiss those individual filings.  *See, e.g.*, *United States v. Egan*, 811 F. Supp. 2d 829, 832-33 (S.D.N.Y. 2011).  The relevant legal standards and particular facts alleged in each of those documents are discussed in more detail *infra*.

1968, taking its legal title from the first letter of each founder's given name—Jerry Haley, Robert Martin, Ellis Martin, Charles Lehman, and Keith Waltz.  The quintet headquartered their operation in Watertown, New York, and began the hard work of growing the franchise into a series of brick-and-mortar stores across Central and Northern New York.

In 1972, Swartz's father Thomas, a practicing Watertown attorney, joined the corporation.  Thomas purchased a minority interest in Jreck Subs from the widow of one of its founders in the early 1980s, and in 1991 he obtained a controlling interest by buying out the surviving founders.  Thomas financed a substantial part of the buyout using promissory notes, issuing separate $365,000 notes to each of the four remaining members.

Thomas never repaid those notes, and his misbehavior on that score later turned out to be just a small piece of the financial misconduct in which he had been engaged.  On January 4, 1996, a federal grand jury sitting in the Northern District of New York returned a four-count indictment against Thomas and Harry S. Pack ("Pack"), another lawyer and the former president of Jefferson National Bank ("JNB") in Watertown, New York.  *See United States v. Pack*, 1996 WL 760178 (N.D.N.Y. Dec. 27, 1996) (Pooler, J.).

Among other things, the federal indictment accused Thomas of giving Pack kickbacks in exchange for funneling JNB's legal business to his own law firm, and alleged that Pack routinely influenced JNB to make improper loans to Thomas and his "affiliated entities."  *Pack*, 1996 WL 760178 at *1.  After a four-week trial that wrapped up in October of 1996, the jury found Thomas and Pack guilty on all counts.  *Id*.

Thomas, possibly in an effort to shelter the family's assets, handed over ownership and control of Jreck Subs to his son.  Guided by his father, Swartz quickly took the company public using a "reverse merger," which occurs when "the private operating company merges

into the public company, usually a shell company, and the public shell company survives the merger with the private operating company's shareholders gaining a controlling interest in the voting power and outstanding shares of capital stock of the public company and the private operating company's management taking over the board of directors and management of the public company."  Lorne & Bryan, 11 Acquisitions & Mergers § 3:11.10.

In textbook fashion, Swartz bought up a Colorado public shell company with no operating assets and merged Jreck Subs, Inc., the private franchise company, into the empty public shell.  What emerged on the other side was a new public company named Jreck Subs Group, Inc., with defendant as its Chief Executive Officer and Director.  Defendant headquartered the new company in Heathrow, Florida, but kept operations, accounting, management, and pretty much everything else in Watertown.

Thereafter, Swartz renamed Jreck Subs Group, Inc. to Ultimate Franchise Systems ("Ultimate Franchise").  The renamed company's business plan called for expansion and in particular the acquisition of multiple additional franchise chains.  Defendant hired Corporate Relations Group ("CRG"), a stock promoter, to help him inflate the value of the Ultimate Franchise stock, which gave him more leverage to finance these planned acquisitions.

Between 1997 and 2000, Swartz used the company's inflated stock value in combination with a series of promissory notes to buy up a string of restaurant businesses, including a 75-store pizza chain in California, a 41-store sandwich chain in Florida, a 43-store sandwich chain in North Carolina, and a restaurant chain with stores in Tennessee, Alabama, Georgia, and Utah.  The Government's sentencing memorandum explains in some detail how defendant orchestrated these acquisitions while simultaneously misappropriating

company funds and concealing existing debts from new investors.  According to the Government, defendant later divested several of these acquisitions into shell companies using his financial tool of choice—promissory notes—that he later failed to pay.

As a publicly traded company, Ultimate Franchise registered its shares with the U.S. Securities and Exchange Commission ("SEC") and disclosed quarterly and annual financial reports.  Yet between tax years 1997 and 2004, the organization never reported an operating profit and never paid income tax.  In fact, after 2004 Swartz made the company "go dark," an industry term for when an entity voluntarily de-registers itself with the SEC.  This move let defendant continue trading the company's stock with only minimal disclosure requirements.

In 2002, Swartz formed Grace Ventures Group, Inc. ("Grace Ventures"), a Delaware corporation, and then "sold" 80 percent of the Jreck Subs franchise to Grace Ventures for approximately $1.996 million.  Under the official terms of this deal, Ultimate Franchise retained a 20 percent interest worth approximately $450,000.  In total, then, this deal valued the Asset at approximately $2.5 million.

Swartz financed the $1.9 million with (1) a $1.3 million promissory note from Grace Ventures to Ultimate Franchise and (2) a purported $696,000 cash payment raised from other sources.  Defendant, in his capacity as CEO of Ultimate Franchise, later reported in SEC filings that Ultimate Franchise had forgiven a substantial portion of the promissory note debt owed by Grace Ventures.  According to these filings, Grace Ventures became unable to fully repay the note due to poorly explained "cash flow problems."  By 2004, Ultimate Franchise had actually written off the entire $1.3 million promissory note in exchange for a purported one-time payment of $475,000 by Grace Ventures.

Importantly, Swartz later admitted that Ultimate Franchise did not actually retain a 20 percent interest in Jreck Subs.  Instead, defendant used some money fronted by other investors to acquire a full 100 percent of the Asset using a promissory note from Grace Ventures (the company he created for this purpose) that he never intended to pay in full.  In effect, this maneuvering netted defendant control of Jreck Subs at a substantial discount.[3]

In December 2005, Swartz did his best to make things even more complicated.  Defendant "assigned" his personal, 100 percent membership of Grace Ventures to another entity, the Swartz Family Trust, apparently in exchange for no consideration.  According to the Government, this sham transfer to the family's trust deterred defendant's unpaid creditors from going after Jreck Subs.  Indeed, defendant later admitted, and multiple witnesses confirmed, that defendant used the Swartz Family Trust and other nominee entities to disguise his ongoing dominion and control over the Asset.

By January 2009, at least some of Swartz's lenders and investors had wised up to his antics.  Some had threatened lawsuits; others had already filed them.  But defendant was not ready to throw in the towel and come clean.  Instead, he sought to bring in some new money, striking a $1.5 million deal with Holding Capital Group, Inc. ("HCG"), a private equity firm headquartered in New York City.

Swartz restructured Jreck Subs in connection with this new deal.  As relevant here, defendant created three new entities under Delaware law:  Jreck Holdings, LLC ("Jreck Holdings") and two subsidiaries, Jreck Operating Company, LLC ("Jreck Operating LLC") and Jreck Franchising Company, LLC ("Jreck Franchising LLC").

---

[3]  According to the Government, the Grace Ventures transaction is the first point at which the entire Asset represented proceeds of defendant's wire fraud scheme.

Next, the trustee of the Swartz Family Trust, acting by virtue of Swartz's earlier "assignment" of his membership in Grace Ventures to the trust, contributed the Asset held by Grace Ventures and, at least on paper, Ultimate Franchise, "up" to the trust, which then handed the consolidated Asset back "down" to Jreck Holdings.  This series of moves gave the holding company ownership of the Asset, with the ownership of the holding company itself split roughly 70/30 between the Swartz Family Trust and an HCG-affiliated entity.

Of course, Swartz did not stop there.  Instead, Jreck Holdings assigned the Asset to its subsidiary, Jreck Operating LLC.  And a few weeks after defendant consummated his deal with the HCG investors, Jreck Operating LLC assigned the Asset back over to Jreck Franchising LLC, the *other* subsidiary Delaware entity created by defendant.

When the dust settled, the Swartz Family Trust and HCG still owned Jreck Holdings in a roughly 70/30 split.  The holding company, in turn, owned the two subsidiaries:  the franchising company, which owned the Asset, and the operating company, which continued to develop and hold corporate-owned Jreck stores.  The final piece of the HCG deal involved a $639,000 loan from HCG to defendant reflected by three promissory notes.

In October 2011, the HCG investors sued Swartz for failing to make payments on—you guessed it—those three promissory notes, a development that spurred him back into action.  To shake off the suit, defendant filed certificates of amendment renaming two of the Jreck entities, changing Jreck Holdings to Focus Acquisitions, LLC ("Focus Acquisitions") and Jreck Franchising LLC to Focus Franchising Company, LLC ("Focus Franchising LLC").

Then, Swartz sought out new investors who could take over HCG's stake in the company.  Individual WR, an attorney and one of defendant's close friends, came through with some fresh blood:  a client of his known as Individual ESO.  To make the buy out of

HCG's stake work, Individual WR formed Orienta Investors, LLC, a Florida entity with 50/50 split ownership between Individual WR and Individual ESO.

Individual WR, for his part, contributed only $1,000 to fund a 50 percent stake in Orienta.  However, Individual ESO funded his own 50 percent stake in the company with a $1 million loan, money which Orienta used to pay off HCG's ~30 percent stake in Jreck Holdings (now known as Focus Acquisitions).  In turn, HCG assigned the original agreements and documentation from its 2009 deal with defendant over to Orienta.[4]  Neither the original documentation (from 2009) nor the purchase agreement between HCG and Orienta (from 2012) reflected the name changes (from Jreck holdings/franchising to Focus acquisitions/franchising) that Swartz executed in 2011.

In March 2013, Swartz formed Focus Franchising, Inc. ("Focus Florida"), a Florida nominee entity, with the help of another long-time associate, Individual AR, whom he named as the sole officer and director.  Between March 2013 and February 2015, Focus Florida seemed to exist solely for the purpose of facilitating the diversion of money from the Asset to defendant.

For example, in June 2014, Individual WR, acting as a nominee for Swartz, opened a bank account with JP Morgan in Florida under the company's name.  Defendant then quietly siphoned off funds from the franchise's ongoing operations in Watertown to the newly created bank account in Florida.  During this time, Focus Franchising LLC (the Delaware entity, not this new Florida entity) continued to hold the Asset.

---

[4]  Orienta's knowledge of, and/or participation in, Swartz's fraud appears to be a contested issue of fact.

By early 2015, things looked pretty bad for Swartz.  A laundry list of creditors were chasing his assets.  A federal grand jury investigation was underway against him.  Even so, defendant made one last-ditch-but-complex effort throw everyone off the trail:  he tried to take Jreck Subs public a second time.

First, Swartz moved the necessary pieces into place.  His father-in-law purchased Easy Organic Cookery, Inc., a public shell company, and renamed it New York Sub Company.  Then, in late February, Focus Acquisitions and Focus Franchising LLC, the two Delaware entities, executed an agreement with Focus Florida.  Under the agreement, the Delaware franchising company transferred the Asset to the Florida company in exchange for all of the Florida company's stock.  This gave Focus Florida the Asset.

Next, in May 2015, Swartz tried to put these two pieces together, executing another reverse merger using the public shell company his father-in-law had bought up for this purpose.  This time, Focus Acquisitions contributed Focus Florida to the public shell company in exchange for the latter company's stock.  According to SEC filings and other documents filed in connection with this transaction, Focus Florida owned the Jreck franchise contract rights, the newly public New York Sub Company owned Focus Florida, and Focus Acquisitions owned all of New York Sub Company's stock.  Ownership of Focus Acquisitions remained split roughly 70/30 between the Swartz Family Trust and Orienta.

Orienta and the Government disagree about whether Orienta's principal(s) knew about, permitted, and/or authorized some or all of this last-ditch maneuvering by Swartz.  But in any event it was unsuccessful:  the Government's criminal prosecution prevented any publicly traded shares in New York Sub Company from being sold.  And after defendant

entered his guilty plea, Focus Acquisitions and New York Sub Company unwound the public offering.

On May 3, 2017, U.S. Magistrate Judge Andrew T. Baxter authorized the Government, through the U.S. Marshals Service ("USMS"), to continue operating the Asset in receivership during the pendency of these proceedings.

## III.  <u>LEGAL STANDARD</u>

Property that constitutes or is derived from proceeds traceable to wire fraud is subject to criminal forfeiture.  *See* 18 U.S.C. § 981(a)(1)(C) (subjecting to civil forfeiture any property traceable to an offense constituting "specified unlawful activity"); § 1956(c)(7) (defining "specified unlawful activity" to include offenses listed in § 1961(1)); § 1961(1)(b) (listing wire fraud among those offenses); *see also* 28 U.S.C. § 2461(c) (providing that property subject to civil forfeiture based on a violation of federal law is also subject to criminal forfeiture in a federal criminal proceeding); *United States v. Schlesinger*, 396 F. Supp. 2d 267 (E.D.N.Y. 2005) (Spatt, J.) (tracing same statutory provisions and reaching same conclusion).

"Section 853 and Federal Rule of Criminal Procedure 32.2 create a two-stage procedural framework for completing a forfeiture."  *United States v. Wolf*, 375 F. Supp. 3d 428, 435 (S.D.N.Y. 2019).  First, the court must "adjudicate the government's interest vis-a-vis the defendant 'without regard to any third party's interest in the property.'"  *United States v. Daugerdas*, 892 F.3d 545, 549 (2d Cir. 2018) (quoting Criminal Rule 32.2(b)(2)(A)); *see also* 21 U.S.C. § 853(k) (prohibiting third parties from intervening in the initial forfeiture proceedings of a criminal matter).

Second, "before entering a final order of forfeiture, the court [must] resolve[ ] any third-party petitioner's interests vis-a-vis the defendant."  *Daugerdas*, 892 F.3d at 549

(quoting 21 U.S.C. § 853(n)(6)(A)).  At this second step, "any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may . . . petition the court for a hearing to adjudicate the validity of his alleged interest in the property."  21 U.S.C. § 853(n); *see also United States v. Chowaiki*, 369 F. Supp. 3d 565, 572 (S.D.N.Y. 2019) ("Third parties claiming an interest in forfeited property may file petitions requesting a hearing.").

The filing of a § 853(n) petition by a third-party claimant initiates an ancillary proceeding that "closely resembles a civil action."  *Pacheco v. Serendensky*, 393 F.3d 348, 352 (2d Cir. 2004).  The petition, which is sworn and must be signed by the petitioner, must also "set forth the nature and circumstances of the petitioner's acquisition of the right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought."  § 853(n)(3).

Importantly, though, "third-party petitions cannot challenge the predicate finding that the Government's interest in the property is superior to the defendant's; they are limited to arguing that the third party's interest trumps the Government's."  *Chowaiki*, 369 F. Supp. 3d 565, 572 (S.D.N.Y. 2019); *see also United States v. Andrews*, 530 F.3d 1232, 1236-37 (10th Cir. 2008) ("[A] third party has no right to challenge the preliminary order's finding of forfeitability; rather the third party is given an opportunity during the ancillary proceeding to assert any ownership interest that would require amendment of the order.").

To prevail, "the petitioner must first establish his standing to challenge the forfeiture order by demonstrating a 'legal interest' in the forfeited property under § 853(n)(2)."  *United States v. Watts*, 786 F.3d 152, 160 (2d Cir. 2015).  "The petitioner must then prove his

entitlement to relief on the merits by establishing, through a preponderance of the evidence, one of two superior claims to the property under § 853(n)(6)." *Id*.

On this last requirement, a petitioner may try to show "either that he (1) had superior title to the defendant at the time of the act giving rise to forfeiture or (2) was a bona fide purchaser for value of the property and 'was at the time of the purchase without cause to believe that the property was subject to forfeiture.'" *Chowaiki*, 369 F. Supp. 3d at 572 (quoting 21 U.S.C. § 853(n)(6)(A), (B)).  "The former provision applies to third parties who had an interest in property before the subject crime was committed (and so before the government's interest vested); the latter applies to third parties who innocently acquire property after the crime."  *Id*.

These so-called "innocent owner" provisions are the only two circumstances under which a court can modify a criminal forfeiture order.  *United States v. Monea Family Trust I*, 626 F.3d 271, 277 (6th Cir. 2010) ("[A] district court can amend an order of forfeiture in only two circumstances."); *United States v. Hooper*, 229 F.3d 818, 822 (9th Cir. 2000) (declining "to create other categories of transferee interests that are protected from forfeiture" in light of the statute's "clear direction").

## IV.  DISCUSSION

As part of his plea, Swartz consented to the entry of an order under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) directing the forfeiture of "any and all interests" he held in the Jreck Subs franchise, including the franchise rights, trademarks, and other brand-related intellectual property.  The Court entered a preliminary order of forfeiture

to that effect on September 23, 2016.[5]  In response, four claimants filed § 853(n) petitions

asserting an interest in the Asset:  (1) Orienta; (2) Change Capital; (3) the Swartz Family

Trust; and (4) Continental Trust.

On September 26 and December 20, 2017, the Government moved under Criminal

Rule 32.2(c)(1)(A) to dismiss all four petitions, but later withdrew its motion against

Orienta.  Thereafter, the Government sought approval to conduct an interlocutory judicial

sale while Orienta moved for injunctive relief related to the ongoing operation of the

franchise.  The Court tackles each remaining challenge in turn.

## A.  The Government's Omnibus Motion to Dismiss

The Government has moved to dismiss the § 853(n) petitions filed by the Swartz

Family Trust and by Continental Trust, two claimants asserting an interest in the Asset.[6]

"The procedures governing ancillary proceedings under § 853(n) are further

elaborated in Rule 32.2(c) of the Federal Rules of Criminal Procedure."  *Watts*, 786 F.3d at

161.  Under Criminal Rule 32.2, "the court may, on motion, dismiss the petition for lack of

standing, for failure to state a claim, or for any other lawful reason."  FED. R. CRIM. P.

32.2(c)(1).  In other words, "a motion to dismiss a third-party petition in a forfeiture

proceeding prior to discovery or a hearing should be treated like a motion to dismiss a civil

complaint under Federal Rule of Civil Procedure 12(b)."  *Chowaiki*, 369 F. Supp. 3d at 572

(quoting *Pacheco*, 393 F.3d at 352).

---

[5]  An amended preliminary order added a money judgment for $12,535,400.  Dkt. No. 66.

[6]  After considering the recent filings, the Court agrees that Change Capital's petition has been mooted.  To the extent petitioner's entitlement to payments it received during the pendency of these proceedings may have been disputed by the Government and/or one or more of the competing claimants, the Court concludes there is no reason to consider those matters any further.

### 1. The Swartz Family Trust

On August 31, 2017, the Swartz Family Trust moved under Rule 60(b)(1) and (6) of the Federal Rules of Civil Procedure seeking leave to file an untimely § 853(n) petition. Dkt. No. 75. The documents filed in support of the trust's motion for leave include a proposed § 853(n) petition as well as an affidavit from Daniel R. Patterson, a Florida resident who claims to be sole trustee. Patterson Aff., Dkt. No. 75-1 ¶ 1.

According to Mr. Patterson's affidavit, the trust holds a 65% ownership interest in Focus Acquisitions. Patterson Aff. ¶ 4. Mr. Patterson claims he was unable to timely move to protect the trust's legal interest in this forfeiture proceeding because, in his words, he was then suffering from "medical incapacitation." *Id*. ¶¶ 2, 6-21.

While its Rule 60 motion remained pending, the trust filed a second § 853(n) petition in which it asserts substantially the same facts as the one attached as an exhibit to its motion for leave. Dkt. No. 80.

On September 26, 2017, the Government moved to dismiss the trust's petition. Dkt. No. 85. According to the Government, the petition is untimely because Mr. Patterson received actual notice of the forfeiture action on February 16, 2017. Dkt. No. 85 ¶ 13 & Ex. D. The Government argues this is true even if the Court accepts Mr. Patterson's representations concerning his medical problems, since he waited three additional months after discovering his error to take any corrective action.

Finally, the Government contends the trust has failed to sufficiently identify a qualifying interest in the Asset itself. According to the Government, merely claiming an interest in another of Swartz's ventures, even a closely related one like Focus Acquisitions, is insufficiently specific under the relatively demanding terms of the forfeiture statute. The

Government reasserted these and other arguments against the trust's petition(s) in its omnibus motion to dismiss.  Dkt. No. 106 at 25-32.[7]

Upon review, the Government has the better of this argument.  Where, as here, a court has ordered the forfeiture of specific property, the Government "must publish notice of the order and send notice to any person who reasonably appears to be a potential claimant with standing to contest the forfeiture in the ancillary proceeding."  FED. R. CRIM. P. 32.2(b)(6)(A); *see also* 21 U.S.C. § 853(n)(1).  Thereafter, a hopeful claimant has "thirty days" from the *earlier* of either "the final publication of notice or his receipt of notice" to petition for a hearing.  21 U.S.C. § 853(n)(2) (emphasis added).

The Government has established, Dkt. No. 18, and Mr. Patterson concedes, Dkt. No. 75-1 ¶ 5, that he received actual notice of this forfeiture proceeding on February 16, 2017, when he signed for a certified letter from the Government containing the requisite statutory notice.  Accordingly, the trust's petition, which was not filed with this Court in any form until August 31, 2017, was filed nearly six months beyond the thirty-day period permitted by § 853(n)(2).

Even assuming Mr. Patterson's alleged medical incapacitation presented a valid reason for delay, revising the chronology of events to account for his illness would still lead to the conclusion that he blew the thirty-day deadline.[8]  According to Mr. Patterson, he does not recall signing for the Government's certified letter in February but does acknowledge that he

---

[7] Pagination corresponds with CM/ECF.

[8] The Advisory Committee Notes to Rule 32.2(c) acknowledge that a Rule 60(b) motion might be the proper vehicle for this kind of request, though the Notes concern themselves with inadequate notice rather than appropriate notice acted upon in a less-than-prompt manner.

later "discovered" the letter containing the notice "by accident" in May 2017 "when searching for something else in stacks of papers" at his home.  Patterson Aff., Dkt. No. 75-1 ¶ 18.

So even crediting this period of delay to its fullest extent and assuming that by "May 2017" Mr. Patterson actually meant "May 31, 2017," the trust's petition would still have been filed nearly two months too late.  Accordingly, the Swartz Family Trust's petition is untimely and will be dismissed.

Untimeliness aside, the trust's petition would fail on the merits for almost all of the reasons advanced by the Government.  For example, although certain documents submitted by the trust have been signed by counsel, *see, e.g.*, Dkt. No. 80-4, neither the proposed § 853(n) petition that petitioner filed as an exhibit to the trust's motion for leave, Dkt. No. 75-2, nor the trust's later-filed § 853(n) petition itself, Dkt. No. 80, has been signed by an attorney.  *See, e.g., Bell v. S. Bay European Corp.*, 486 F. Supp. 2d 257, 259 (S.D.N.Y. 2007) ("A trust is deemed an artificial entity for the purposes of the rule barring a nonlawyer trustee from representing the interests of the trust.").

Beyond that, the trust has failed to plausibly plead an interest in the Asset that is superior to the Government's own, which vested the moment Swartz tainted the property with his criminal conduct.  *Chowaiki*, 369 F. Supp. 3d at 571 ("Title to such property vests in the United States 'upon commission of the act giving rise to forfeiture.'"  (quoting 18 U.S.C. § 981(f)).

"Under the 'relation-back' doctrine of § 853(c), the government's interest in the proceeds of a fraud vests as soon as those proceeds come into existence, and is therefore superior to that of any subsequent third-party recipient of those funds (unless the third party is a bona fide purchaser for value)."  *Daugerdas*, 892 F.3d at 548.

And the definition of "proceeds" is a broad one, meaning "property of any kind obtained directly or *indirectly*, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  18 U.S.C. § 981(a)(2)(A) (emphasis added).

In other words, "[p]roceeds are property that a person would not have but for the criminal offense . . . . "  *United States v. Nicolo*, 597 F. Supp. 2d 342, 346 (W.D.N.Y. 2009) (citation omitted).  By the time the Swartz Family Trust obtained its alleged interest in the Asset for the first time in December 2005 as part of defendant's sham transaction with Grace Ventures, defendant's wire fraud scheme was already well underway.

Various admissions made by Swartz as part of his plea agreement conclusively establish that the 2002 formation of Grace Ventures and its subsequent acquisition of the Asset using money from other investors and a promissory note that defendant later manipulated into a total write off were part and parcel of the wire fraud itself.

But for this fraudulent transfer to Grace Ventures, Swartz would not have obtained full control of the Asset at that time.  *Nicolo*, 597 F. Supp. 2d at 346.  And rather than demonstrate that the trust was a bona fide purchaser for value, defendant's transfer of the Asset to the trust (for no consideration) was in fact a sham transaction made in furtherance of the same fraudulent scheme.  Accordingly, for these reasons, and for the other reasons set forth in detail in the Government's filings, the trust's petition would also be subject to dismissal for failure to state a plausible claim.

## 2. **Continental Trust**

On September 27, 2017, Continental Trust filed a § 853(n) petition in which it claimed that Focus Florida owes a debt totaling $409,000 reflected in two promissory notes.  Dkt. No. 86.  In particular, the petition asserts that Focus Florida issued a $300,000 promissory note to Continental Trust on January 27, 2014.  Dkt. No. 86.  The petition further asserts that Focus Florida issued a $109,000 promissory note to Stilton Management Limited ("SML") on May 18, 2015, which SML later assigned to Continental Trust.  *Id.*  According to Continental trust, it "has never received any formal notification" from the Government about this forfeiture proceeding.  *Id.*

Before turning to the Government's arguments in favor of dismissal, the Court notes that a review of the documents attached to Continental Trust's petition tell a slightly different story.  The January 2014 note was written to SML, not the May 2015 one.  *Compare* Dkt. No. 86 at 11, with *id*. at 6.  And perhaps more importantly, the January 2014 note has not even been countersigned by a representative from Focus Florida.  *Id*. at 11.

On the merits, the Government contends that Continental Trust has failed to comply with the strict pleading requirements set forth in § 853(n)(3).  *United States v. Burge*, 829 F. Supp. 2d 664, 667 (C.D. Ill. 2011) ("Federal courts require strict compliance with the pleading requirements of § 853(n)(3), primarily because there is a substantial danger of false claims in forfeiture proceedings.").

The Government is correct.  First, Continental Trust's petition has not been signed under penalty of perjury and it does not contain any language consistent with 28 U.S.C. § 1746, which permits unsworn declarations in a certain form.  *See, e.g.*, *United States v. Speed Joyeros, S.A.*, 410 F. Supp. 2d 121, 124 (E.D.N.Y. 2006) (Weinstein,

J.) ("Requiring the claimant to sign personally under penalty of perjury serves the government's legitimate interest in protecting forfeited assets.").

Second, Continental Trust's petition merely states an amount of alleged indebtedness traceable to Focus Florida without setting forth "the nature and extent" of its "right title or interest" in the specific property subject to forfeiture; *i.e.*, the Asset.  *Cf. DSI Assocs. LLC v. United States*, 496 F.3d 175, 184 (2d Cir. 2007) (explaining that a general, unsecured creditor does not have standing to proceed under § 853(n)).  Third and relatedly, Continental Trust's petition fails to set forth "the time and circumstances" of its "acquisition of the right, title or interest" in the Asset.  *See id.*  To the contrary, it merely sets forth two occasions on which another entity, Focus Florida, issued promissory notes to the petitioner.

Fourth, and just like the Swartz Family Trust, Continental Trust's petition is not signed by an attorney even though it is a separate legal entity that must be represented by counsel in federal court.  *See, e.g.*, *Bell*, 486 F. Supp. 2d at 260 "[A] lay person may not represent an entity.").  Accordingly, the Government's motion to dismiss Continental Trust's petition will be granted.

## B.  <u>The Government's Motion for Interlocutory Sale</u>

On May 9, 2018, the Government moved under Criminal Rule 32.2(b)(7) for approval to conduct an interlocutory public judicial sale of Jreck Subs.  According to the Government, a sale is necessary and justified because, in its view, "placing clean title to the Asset into the hands of new owners untethered to and at arms-length from Swartz and his co-conspirators" will "resolve the uncertainty of ownership and allow the business, and its franchisee owners, to plan and pursue profitable opportunities."  Gov.'s Mem., Dkt. No. 120, at 6.

In opposition, Orienta asserts that the Government simply wants to "cram down a sale and wipe its hands of its responsibilities as receiver, rather than make the effort to properly carry out its duties as a fiduciary."  Orienta Opp'n, Dkt. No. 135-1, 3.  According to Orienta, the value of the Asset will be lower if sold at auction rather than awarded to petitioner at the close of these ancillary proceedings.  *Id*. at 7.

The Government's reply sets forth in detail the "significant risk presented to the value of the Asset" if it remains "in limbo pending the ancillary proceedings."  Gov. Reply, Dkt. No. 136, 3.  As the Government explains, years of financial abuse at the hands of Swartz and his nominees has harmed the long-term stability of the franchise, and the remaining franchisees are operating under limited extensions to prior franchise agreements.  *Id*. at 4.  According to the Government, the ancillary proceeding necessary to adjudicate the remaining claim by Orienta will be complex and is likely to take an extended period of time.  *Id*. at 3-5.

"At any time before entry of a final forfeiture order, the court, in accordance with Supplemental Rule G(7) of the Federal Rules of Civil Procedure, may order the interlocutory sale of property alleged to be forfeitable."  FED. R. CRIM. P. 32.2(b)(7).  Under Supplemental Rule G(7), the court may order all or part of the property sold if:

> (A)   the property is perishable or at risk of deterioration, decay, or injury by being detained in custody pending the action;
>
> (B)   the expense of keeping the property is excessive or is disproportionate to its fair market value;
>
> (C)   the property is subject to a mortgage or to taxes on which the owner is in default; or
>
> (D)   the court finds other good cause.

FED. R. CIV. P. SUPP. R. G(7)(b)(i).

If the court determines a sale is appropriate, Supplemental Rule G(7) sets forth who can make the sale (an authorized federal agency or any person designated by the court), the procedures governing the sale (the provisions of 28 U.S.C. §§ 2001, 2002, and 2004, unless the court approves other ones the parties agree on), and what will happen to the sale proceeds, since they are a substitute *res* that remains subject to forfeiture (they are held in an interest-bearing account by the Government). FED. R. CIV. P. SUPP. R. G(7)(b)(ii)–(iv).

Upon careful review of the parties' submissions, the Court concludes a judicial sale is appropriate at this time. Orienta is no doubt correct that "court[s] must carefully weigh the competing interests in each case" when deciding whether to grant a request for interlocutory sale. *United States v. Hall*, 877 F.3d 676, 685 (6th Cir. 2017) (quoting FED. R. CIV. P. SUPP. R. G(7) advisory comm. notes).

Even so, the Asset is at serious risk of deterioration, decay, or injury if it continues to remain in custody pending the resolution of the ancillary proceeding with Orienta. The USMS is not particularly well-equipped to manage a complex, ongoing enterprise like a franchised chain of restaurants. Although the Government wisely retained the services of an experienced franchisee to assist it with operations, merely staying the course will not be enough to ensure the continued value of the Asset.

For instance, the Government's submissions establish that some franchise locations have closed due to the lack of profitability, and the future of the franchise's overarching operation remains uncertain. Indeed, the franchise has struggled to stabilize, and has certainly faced additional obstacles to growth and expansion, while the Asset has remained in receivership. Among other things, the Government has represented that the present lack

of a valid Franchise Disclosure Document ("FDD") renders it unlawful to sell new franchises to interested franchisees.

In particular, the Court finds persuasive the Government's submissions establishing that the long-running shell game Swartz played with various corporate entities has made it more or less impossible for anyone to move forward at the helm of Jreck Subs until a sale places clean title into the hands of a new owner. *See United States v. Approximately 81,454 Cans of Baby Formula*, 560 F.3d 638, 641 (7th Cir. 2009) (Posner, J.) (suggesting trial judges "can range widely in deciding what factors to consider, and what weight to give them" when confronted with the difficult question of whether to approve a request for interlocutory judicial sale).

Further, "good cause" exists to approve a judicial sale at this time.  Swartz has no remaining claim to the Asset.  Orienta's opposition warns of the possibility that the sale of the Asset at auction "will retrieve a lower price than the value the Asset would have in the possession of the party that prevails" in the ancillary proceeding.  Orienta Opp'n at 17.  In Orienta's view, "if there is even a scintilla of doubt that the amount garnered from a sale would be sufficient to fully compensate Orienta," the motion for sale should be denied.  *Id*.

That is not the case.  Even if Orienta is able to clear away the various roadblocks to success on its petition that are detailed extensively in the Government's memoranda, Orienta's stake in the Asset is as a secured creditor and 35% equity member owed an additional $1.4 million in first priority debt.  *See* Dkt. No. 103.  There is absolutely no indication anywhere that the legally required "commercially reasonable" sale of the franchise would leave Orienta unpaid.  *See* 21 U.S.C. § 853(h).  Accordingly, the Government's motion for interlocutory judicial sale of the Asset will be granted.

C. <u>Orienta's Motion for Injunctive Relief</u>

On May 9, 2018, Orienta moved under Federal Rule of Civil Procedure ("Rule") 65 for a preliminary injunction that would enjoin the U.S. Marshals Service from "certain actions and transactions . . . that will damage the economic viability of the [Asset]." Orienta Mem., Dkt. No. 119-3 at 3. In addition, Orienta demanded an accounting of the receivership. *Id*.

In opposition, the Government responds that Orienta's arguments are speculative, since much of the alleged harm has not occurred. Gov. Opp'n, Dkt. No. 132 at 5-6. Further, some of the actions challenged by Orienta are necessary to the ongoing operation of the Asset. *Id*. at 7-10. According to the Government, the challenged conduct is shielded by the business judgment rule that governs management decisions under Delaware law. *Id*. at 8.

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Avitabile v. Beach*, 277 F. Supp. 3d 326, 332 (N.D.N.Y. 2017) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

The party seeking preliminary relief must show:  "(1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor (3) that the balance of hardships tips in their favor regardless of the likelihood of success; and (4) that an injunction is in the public interest." *Avitabile*, 277 F. Supp. 3d at 332-33 (quoting *Williams v. Conway*, 236 F. Supp. 3d 554, 581 (N.D.N.Y. 2017)).

Ultimately, "[t]he party seeking the injunction carries the burden of persuasion to demonstrate, 'by a clear showing,' that the necessary elements are satisfied." *Avitabile*, 277 F. Supp. 3d at 333 (quoting *Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446, 452 (S.D.N.Y. 2011)).

Upon review of Orienta's submissions, it has not carried its burden here.  Even accepting Orienta's claim that amendments to the vendor agreements might be harmful in some way, the Government has proffered legitimate business reasons for the proposed conduct and, what's more, those determinations appears to be the sort of day-to-day business decisions that would not require Orienta's consent.  *See* Dkt. No. 119-5 at 11 (requiring prior approval for "material change in the nature of the business" under January 7, 2009 operating agreement).  Further, the Government has already provided to Orienta certain requested accounting information.  *See* Dkt. No. 132 at 21 & Exhibits.  Accordingly, Orienta's motion for injunctive relief will be denied.

## V.  <u>CONCLUSION</u>

Swartz forfeited his right to own and operate the business handed down from his father when he abused the company's good reputation to rip off investors.  Though Orienta's § 853(n) petition remains for further proceedings, the Government is right about one thing:  placing clean title to the Asset into the hands of new owners will resolve the cloud of uncertainty hovering over the whole enterprise and prevent a further deterioration in value.

Therefore, it is

ORDERED that

1.  The Government's Omnibus Motion to Dismiss Petitioners' Claims (Dkt. No. 106) is GRANTED in part and DENIED in part;

2.  The § 853 petitions of the Swartz Family Trust and Continental Trust Corporation Limited are DISMISSED;

3.  The § 853 petition of Change Capital Partners Fund I, LLC is DISMISSED as moot;

4.  The § 853 petition filed by Orienta Investors, LLC remains for discovery;

5.  Orienta Investors, LLC's Motion for a Temporary Restraining Order and a Preliminary Injunction (Dkt. No. 119) is DENIED;

6.  The Government's Motion for an Interlocutory Sale (Dkt. No. 120) is GRANTED, subject to a set of terms that will be finalized in accordance with the following procedure:

a.  The Government shall file a proposed order on or before Friday, August 16, 2019, setting forth the particulars of the sale, and this filing shall include a detailed explanation of the sale process[9];

b.  Orienta Investors, LLC may file a response setting forth different or additional proposed terms of sale on or before Friday, August 23, 2019; and

7.  The Clerk of the Court is directed to terminate any pending motions.

IT IS SO ORDERED.

Dated:  August 9, 2019
        Utica, New York.

_____
United States District Judge

---

[9]  The Government supplied a set of proposals in its motion for sale, *see* Dkt. No. 120 at 7-9, and in its reply brief, Dkt. No. 136 at 13-14.  Given that circumstances may have changed since the filing of those submissions, *see, e.g.*, Dkt. Nos. 181, 183-85, the Court seeks a consolidated, updated proposal for final approval.