UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

         -v-                          5:16-CR-264

CHRISTOPHER M. SWARTZ,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                    OF COUNSEL:

HON. ANTOINETTE T. BACON                        TAMARA THOMSON, ESQ.
Acting United States Attorney for the           Ass't United States Attorney
  Northern District of New York
100 South Clinton Street, P.O. Box 7198         CLIFFORD R.R. KRIEGER, ESQ.
Syracuse, NY 13261                              Special Ass't United States Attorney

UNITED STATES DEPARTMENT                         JOHN N. KANE, JR., ESQ.
  OF JUSTICE - TAX DIVISION
Northern Criminal Enforcement Section
601 D Street NW, Room 7122
Washington, DC 20530

AKERMAN LLP                                      SCOTT M. KESSLER, ESQ.
Attorneys for Claimant Orienta
666 Fifth Avenue, 20th Floor
New York, NY 10103

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION & ORDER

## I. INTRODUCTION

      This is the epilogue to the Government's prosecution of Christopher Swartz, a

fraudster and tax cheat who leveraged his control over a franchised chain of sandwich shops

and a host of related business entities to rip off unsuspecting investors and evade his

obligations to the IRS.  When the law finally caught up with Swartz, he pleaded guilty to a two-count information that charged him with wire fraud in violation of 18 U.S.C. § 1343 and tax evasion in violation of 26 U.S.C. § 7201.  Dkt. Nos. 1-3.

As part of his plea agreement, Swartz consented to the entry of an order under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) directing the forfeiture of "any and all interests" he held in the Jreck Subs franchise, including the franchise rights, trademarks, and other brand-related intellectual property ("Jreck Subs" or the "Asset").  The Court entered a preliminary order of forfeiture to that effect on September 23, 2016.[1]  Dkt. No. 9.

On July 12, 2017, the Court sentenced Swartz to 150 months' imprisonment and ordered him to pay restitution of $21,041,249 to his wire fraud victims and $4,619,340 to the IRS.  Dkt. No. 51.  Swartz's sentence was affirmed on direct appeal, *United States v. Swartz*, 758 F. App'x 108 (2d Cir. 2018) (summary order), and his later-filed motion for collateral relief under 28 U.S.C. § 2255 was denied as meritless, Dkt. No. 252.

Unfortunately, though, putting Swartz away for his crimes did not put an end to legal proceedings over the ownership and control of Jreck Subs.  Although Swartz might have taken himself out of the running as part of his plea agreement, four other claimants filed petitions under 21 U.S.C. § 853(n) in which they asserted a legal interest in some or all of the Asset:  (1) Edward St. Onge and Orienta Investors, LLC ("Orienta"), (2) Change Capital Partners Fund I, LLC, (3) the Swartz Family Trust, and (4) Continental Trust Corporation Limited.

---

[1] An amended preliminary order of forfeiture entered after sentencing added a money judgment for $12,535,400.  Dkt. No. 66.

On September 26 and December 20, 2017, the Government moved under Federal Rule of Criminal Procedure ("Criminal Rule") 32.2(c)(1)(A) to dismiss the § 853(n) petitions filed by all four claimants.  Dkt. Nos. 85, 106, 176, 177.  The Swartz Family Trust and Orienta opposed dismissal, Dkt. Nos. 89, 112, and in reply the Government withdrew its motion to dismiss Orienta's petition, Dkt. No. 117, but not its motion to dismiss the other three petitions, Dkt. No. 159.  The Court received full briefing on these motions and took them on submission of the papers.

On May 9, 2018, while the Government's motions to dismiss remained *sub judice*, Orienta and the Government filed an additional pair of motions.  Orienta, for its part, requested injunctive relief related to the Jreck Subs franchise, which had continued operating in receivership under the supervision of the U.S. Marshals Service.  Dkt. No. 119.  The Government, on the other hand, sought judicial approval under Criminal Rule 32.2(b)(7) to conduct an interlocutory sale of the Asset; *i.e.*, to sell Jreck Subs at auction even though the third-party claims asserted by the § 853(n) petitioners were still pending.  Dkt. No. 120.  Oral argument was heard on these two motions on June 1, 2018.

On August 9, 2019, the Court denied Orienta's motion for preliminary relief, granted the Government's motion to dismiss the § 853(n) petitions filed by the other three claimants, and approved the Government's sale request.  *United States v. Swartz*, 391 F. Supp. 3d 199, 216 (N.D.N.Y. 2019).  After repeated interventions by this Court and an emergency trip to the Second Circuit, the Government successfully auctioned off the Asset at the tail end of the 2019 calendar year.  *See, e.g.*, Dkt. Nos. 205, 207, 210, 215, 217, 219, 226-29.

That left Orienta as the only third-party claimant.  The Government initially sought and received an order from this Court under Criminal Rule 32.2(c)(1)(B) that permitted the parties

to conduct discovery into Orienta's alleged interest in the Asset, which if successful would have been satisfied by proceeds from the sale.[2]  Dkt. No. 216.  However, on July 22, 2020, the Government renewed its motion to dismiss Orienta's § 853(n) petition and sought to stay discovery until the motion could be decided.  Dkt. No. 248.  The Court stayed discovery and directed Orienta to file a response.  Dkt. No. 251.  The motion has now been fully briefed and will be considered on the basis of the submissions without oral argument.

## II. __BACKGROUND__

The complete story of how and when the Asset became entangled in Swartz's criminal scheme is available in the August 9 MDO.  *Swartz*, 391 F. Supp. 3d at 204-09.  The reader's familiarity with that source of background material will be assumed for the purpose of deciding the Government's renewed motion to dismiss Orienta's petition.  However, an abridged version of the story is also included below because ownership of the Asset is of central importance to the parties' dispute.[3]

The franchise traces its roots to the summer of 1967, when three schoolteachers looking to supplement their income purchased a decommissioned school bus.  They set up shop at the entrance to the local U.S. Army base, where they sold submarine sandwiches to the soldiers stationed there.  It turned out to be a good business model, and the next summer the three original founders invited two more friends to join the burgeoning enterprise.

---

[2]  The Order approving the terms of interlocutory sale of the Asset instructed that "[a]ny and all claims and defenses applicable to, arising from, or secured by, the Asset shall, after the sale, be applied to and payable solely from the substitute res, including any and all claims from Orienta."  Dkt. No. 203.

[3]  The background was taken from a review of the entire record.  Notably, however, the specific factual allegations made in Orienta's operative petition will be assumed true for the purpose of resolving the Government's motion to dismiss.  *See, e.g.*, *United States v. Egan*, 811 F. Supp. 2d 829, 832-33 (S.D.N.Y. 2011).

The franchise assumed the corporate form in 1968, taking its legal title from the first letter of each founder's given name—Jerry Haley, Robert Martin, Ellis Martin, Charles Lehman, and Keith Waltz.  The group headquartered Jreck Subs in Watertown, New York, and began growing the business into a series of brick-and-mortar stores across Central and Northern New York.

In 1972, Swartz's father Thomas, then a practicing Watertown attorney, joined the corporation.  Thomas initially purchased a minority interest in Jreck Subs from the widow of one of its founders in the early 1980s, but in 1991 he obtained a controlling interest by buying out the surviving founders.  Thomas financed a substantial part of the buyout using promissory notes, issuing separate $365,000 notes to each of the four remaining members.  Thomas never repaid those notes.

On January 4, 1996, a federal grand jury sitting in the Northern District of New York returned a four-count indictment against Thomas and Harry S. Pack ("Pack"), another lawyer and the former president of Jefferson National Bank in Watertown, New York.  *See United States v. Pack*, 1996 WL 760178 (N.D.N.Y. Dec. 27, 1996) (Pooler, J.).  Among other things, the federal indictment accused Thomas of giving Pack kickbacks in exchange for funneling the bank's legal business to Thomas's law firm, and alleged that Pack routinely influenced the bank to make improper loans to Thomas and business entities he controlled.  *Id*. at *1.  After a four-week trial that wrapped up in October of 1996, the jury found both defendants guilty on all counts.  *Id*.

Thomas, possibly in an effort to shelter assets from forfeiture, handed over ownership and control of Jreck Subs to his son.  Thereafter, Swartz took the company public using a "reverse merger," which occurs when "the private operating company merges into the public

company, usually a shell company, and the public shell company survives the merger with the private operating company's shareholders gaining a controlling interest in the voting power and outstanding shares of capital stock of the public company and the private operating company's management taking over the board of directors and management of the public company."  Lorne & Bryan, 11 *Acquisitions & Mergers* § 3:11.10.

In textbook fashion, Swartz bought up a Colorado public shell company with no operating assets and merged Jreck Subs, Inc., the private franchise company, into the empty public shell.  What emerged on the other side was a new public company named Jreck Subs Group, Inc., with Swartz as its Chief Executive Officer and Director.  Swartz headquartered the new company in Heathrow, Florida, but kept operations, accounting, management, and pretty much everything else in Watertown.

Thereafter, Swartz renamed Jreck Subs Group, Inc. to Ultimate Franchise Systems ("Ultimate Franchise").  The renamed company's business plan called for expansion and in particular the acquisition of multiple additional franchise chains.  Swartz hired Corporate Relations Group ("CRG"), a stock promoter, to help him inflate the value of the Ultimate Franchise stock, which gave him more leverage to finance these acquisitions.

Between 1997 and 2000, Swartz used the company's inflated stock value in combination with a series of promissory notes to buy up a string of additional restaurant businesses, including a 75-store pizza chain in California, a 41-store sandwich chain in Florida, a 43-store sandwich chain in North Carolina, and a restaurant chain with stores in Tennessee, Alabama, Georgia, and Utah.  Swartz orchestrated these transactions while simultaneously misappropriating funds from Ultimate Franchise and concealing existing

debts from new investors.  Swartz later divested several of these acquisitions into shell companies using promissory notes that he later failed to pay.

As a publicly traded company, Ultimate Franchise registered its shares with the U.S. Securities and Exchange Commission ("SEC") and disclosed quarterly and annual financial reports.  Yet between tax years 1997 and 2004, the organization never reported an operating profit and never paid income tax.  In fact, after 2004 Swartz made the company "go dark," an industry term for when an entity voluntarily de-registers itself with the SEC.  Going dark allowed Swartz to continue trading the Ultimate Franchise stock with only minimal disclosure requirements.

In 2002, Swartz formed Grace Ventures Group, Inc. ("Grace Ventures"), a Delaware corporation, and then "sold" 80 percent of the Jreck Subs franchise to Grace Ventures for approximately $1.996 million.  Under the official terms of this deal, Ultimate Franchise retained a 20 percent interest worth approximately $450,000.  In total, then, this deal valued the Asset at approximately $2.5 million.  Swartz financed the $1.9 million with (1) a $1.3 million promissory note from Grace Ventures to Ultimate Franchise and (2) a purported $696,000 cash payment raised from other sources.

Swartz, in his capacity as CEO of Ultimate Franchise, later reported in SEC filings that Ultimate Franchise forgave a substantial portion of the $1.3 million promissory note debt owed by Grace Ventures.  According to these filings, Grace Ventures became unable to fully repay the note due to poorly explained "cash flow problems."  By 2004, Ultimate Franchise had actually written off the entire $1.3 million promissory note in exchange for a purported one-time payment of $475,000 by Grace Ventures.

Importantly, the 20 percent interest in Jreck Subs that Ultimate Franchise purportedly retained as part of this deal with Grace Ventures was actually a sham.  Instead, Swartz used money fronted by other investors to acquire a full 100 percent of the Asset using a promissory note from Grace Ventures (the company he created for this purpose) that he never intended to pay in full.  Indeed, Swartz admitted that he and Grace Ventures owned 100 percent of the Asset as a result of this sleight of hand, which netted Swartz full control at a substantial discount.  And because the Grace Ventures transaction involved 100 percent of Jreck Subs, the entire Asset represented proceeds of Swartz's wire fraud scheme.

In December 2005, Swartz added another layer of concealment over his ownership and control of Jreck Subs by "assigning" his personal, 100 percent membership in Grace Ventures to another entity, the Swartz Family Trust, in exchange for no consideration.  This sham transfer to the family's trust helped deter Swartz's unpaid creditors from going after the Asset.  Swartz later admitted, and multiple witnesses confirmed, that he used the Swartz Family Trust and other nominee entities to disguise his ongoing control over the Asset.

By January of 2009, many of Swartz's lenders and investors had grown suspicious or distrustful of his ability to repay them.  Some had threatened lawsuits; others had filed them.  In an effort to keep his Ponzi-like promissory note scheme going, Swartz sought to bring in new money by striking a $1.5 million deal with Holding Capital Group, Inc. ("HCG"), a private equity firm headquartered in New York City.

Swartz restructured Jreck Subs in connection with this deal.  First, Swartz created three new entities under Delaware law:  Jreck Holdings, LLC ("Jreck Holdings") and two subsidiaries, Jreck Operating Company, LLC ("Jreck Operating LLC") and Jreck Franchising Company, LLC ("Jreck Franchising LLC").  Next, the trustee of the Swartz Family Trust,

acting by virtue of Swartz's earlier "assignment" of his membership in Grace Ventures to the family trust, contributed the Asset jointly held by Grace Ventures and, at least on paper, Ultimate Franchise, "up" to the family trust, which then handed the consolidated Asset back "down" to Jreck Holdings.  This series of paper moves gave the holding company full ownership of the Asset, with the ownership of the holding company itself split roughly 70/30 between the Swartz Family Trust and an HCG-affiliated entity.

However, Swartz did not stop there.  Instead, Jreck Holdings assigned the Asset to its subsidiary, Jreck Operating LLC.  And a few weeks after Swartz consummated his new deal with the HCG investors, Jreck Operating LLC assigned the Asset back over to Jreck Franchising LLC, the *other* subsidiary Delaware entity created by Swartz.  With this maneuvering completed, the Swartz Family Trust and HCG owned Jreck Holdings in a roughly 70/30 split.

The holding company, in turn, owned the two subsidiaries:  the franchising company, which appeared to own the Asset, and the operating company, which continued to develop and hold corporate-owned Jreck sub shops.  The final piece of the HCG deal involved a $639,000 loan from HCG to Swartz reflected by three promissory notes secured by the franchising company and the Asset.

In October 2011, the HCG investors sued Swartz for failing to make payments on the three promissory notes.  HCG also threatened to seize the Asset if Swartz failed to pay.  To defeat this lawsuit, Swartz filed certificates of amendment renaming two of the Jreck entities, changing Jreck Holdings to Focus Acquisitions, LLC ("Focus Acquisitions") and Jreck Franchising LLC to Focus Franchising Company, LLC ("Focus Franchising LLC").

Swartz also sought out new investors who could pay off and take over HCG's stake.  Individual WR, an attorney and one of Swartz's close friends, identified a client of his known as Individual ESO.  To make the buyout of HCG's stake work, Individual WR formed Orienta Investors, LLC, a Florida entity with 50/50 split ownership between Individual WR and Individual ESO.  Individual WR, for his part, contributed only $1,000 to fund a 50 percent stake in Orienta.

However, Individual ESO funded his own 50 percent stake in the company with a $1 million loan, money which Orienta used to pay off HCG's roughly 30 percent stake in Jreck Holdings (now known as Focus Acquisitions).  In exchange, HCG assigned the original agreements and documentation from its 2009 deal with Swartz over to Orienta.  Neither the original documentation (from 2009) nor the purchase agreement between HCG and Orienta (from 2012) reflected the name changes (from Jreck holdings/franchising to Focus acquisitions/franchising) that Swartz executed in 2011.

In March 2013, Swartz formed Focus Franchising, Inc. ("Focus Florida"), a Florida nominee entity, with the help of another long-time associate, Individual AR, whom he named as the sole officer and director.  Between March 2013 and February 2015, Focus Florida seemed to exist solely for the purpose of facilitating the diversion of money from the Asset.  For example, in June 2014, Individual WR, acting as a nominee for Swartz, opened a bank account with JP Morgan in Florida under the company's name.  Swartz then siphoned off funds from the ongoing operations in Watertown to the newly created bank account in Florida.  During this time, Focus Franchising LLC (the Delaware entity, not this new Florida entity) continued to hold the Asset.

By early 2015, Swartz's scheming had become unsustainable.  Multiple creditors had secured judgments against him.  A federal grand jury investigation was also underway.  Even so, Swartz made one final effort to throw everyone off the trail:  he tried to take Jreck Subs public a second time.  First, Swartz moved the necessary pieces into place.  His father-in-law purchased Easy Organic Cookery, Inc., a public shell company, and renamed it New York Sub Company.  Then, in late February, Focus Acquisitions and Focus Franchising LLC, the two Delaware entities, executed an agreement with Focus Florida.  Under the agreement, the Delaware franchising company transferred the Asset to the Florida company in exchange for all of the Florida company's stock.  This gave Focus Florida nominal ownership of the Asset.

Next, in May 2015, Swartz executed another reverse merger using New York Sub Company, the public shell company his father-in-law had bought up for this purpose.  This time, Focus Acquisitions contributed Focus Florida to the shell company in exchange for all the shell company's stock.  According to SEC filings and other documents filed in connection with this transaction, Focus Florida owned the Jreck franchise contract rights, Focus Florida was a wholly owned subsidiary of New York Sub Company (the newly public shell company), and Focus Acquisitions owned all of New York Sub Company's stock.  Ownership of Focus Acquisitions remained split roughly 70/30 between the Swartz Family Trust and Orienta.

This last-ditch maneuvering proved unsuccessful.  The Government's developing criminal case prevented any publicly traded shares in New York Sub Company from being sold.  And after Swartz entered his guilty plea, Focus Acquisitions and New York Sub Company unwound the public offering, which returned nominal control of the Asset to Focus Florida.  Clear title to the Asset has since been sold through the interlocutory sale authorized by the Court on August 9, 2019.  *Swartz*, 391 F. Supp. 3d at 216-17.

## III.  **LEGAL STANDARD**

"Section 853 and Federal Rule of Criminal Procedure 32.2 create a two-stage procedural framework for completing a forfeiture."  *United States v. Wolf*, 375 F. Supp. 3d 428, 435 (S.D.N.Y. 2019).  First, the court must "adjudicate the government's interest vis-a-vis the defendant 'without regard to any third party's interest in the property.'"  *United States v. Daugerdas*, 892 F.3d 545, 549 (2d Cir. 2018) (quoting Criminal Rule 32.2(b)(2)(A)); *see also* 21 U.S.C. § 853(k) (prohibiting third parties from intervening in the initial forfeiture proceedings).  Second, "before entering a final order of forfeiture, the court [must] resolve[ ] any third-party petitioner's interests vis-a-vis the defendant."  *Daugerdas*, 892 F.3d at 549 (quoting 21 U.S.C. § 853(n)(6)(A)).

At the second step, "any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may . . . petition the court for a hearing to adjudicate the validity of his alleged interest in the property."  21 U.S.C. § 853(n); *see also United States v. Chowaiki*, 369 F. Supp. 3d 565, 572 (S.D.N.Y. 2019) ("Third parties claiming an interest in forfeited property may file petitions requesting a hearing.").

Importantly, however, "third-party petitions cannot challenge the predicate finding that the Government's interest in the property is superior to the defendant's; they are limited to arguing that the third party's interest trumps the Government's."  *Chowaiki*, 369 F. Supp. 3d 565, 572 (S.D.N.Y. 2019); *see also United States v. Andrews*, 530 F.3d 1232, 1236-37 (10th Cir. 2008) ("[A] third party has no right to challenge the preliminary order's finding of forfeitability; rather the third party is given an opportunity during the ancillary proceeding to assert any ownership interest that would require amendment of the order.").

- 12 -

To prevail, "the petitioner must first establish his standing to challenge the forfeiture order by demonstrating a 'legal interest' in the forfeited property under § 853(n)(2)." *United States v. Watts*, 786 F.3d 152, 160 (2d Cir. 2015). "The petitioner must then prove his entitlement to relief on the merits by establishing, through a preponderance of the evidence, one of two superior claims to the property under § 853(n)(6)." *Id*.

Under § 853(n)(6), a claimant must establish that it "(1) had superior title to the defendant at the time of the act giving rise to forfeiture or (2) was a bona fide purchaser for value of the property and 'was at the time of the purchase without cause to believe that the property was subject to forfeiture.'" *Chowaiki*, 369 F. Supp. 3d at 572 (quoting 21 U.S.C. § 853(n)(6)(A), (B)). "The former provision applies to third parties who had an interest in property before the subject crime was committed (and so before the government's interest vested); the latter applies to third parties who innocently acquire property after the crime." *Id*.

These are the only two circumstances under which a court can modify a criminal forfeiture order. *Swartz*, 391 F. Supp. 3d at 210; *see also United States v. Monea Family Trust I*, 626 F.3d 271, 277 (6th Cir. 2010) ("[A] district court can amend an order of forfeiture in only two circumstances."); *United States v. Hooper*, 229 F.3d 818, 822 (9th Cir. 2000) (declining "to create other categories of transferee interests that are protected from forfeiture" in light of the statute's "clear direction").

## IV.  DISCUSSION

On September 23, 2016, the Court entered a preliminary order directing the forfeiture of "any and all interests" Swartz held in the Jreck Subs franchise, including the franchise rights, trademarks, and other brand-related intellectual property. Dkt. No. 9. An amended preliminary order of forfeiture entered after sentencing added a money judgment

for $12,535,400.  Dkt. No. 66.  Thereafter, Orienta timely filed a § 853(n) petition in which it asserted (1) a 35 percent equity ownership interest in Focus Acquisitions, LLC; and (2) a security interest in debt based on certain loans and security agreements that Orienta extended to Swartz and his nominee entities.[4]  Dkt. Nos. 35, 43.

"The filing of a § 853(n) petition by a third-party claimant initiates an ancillary proceeding that 'closely resembles a civil action.'"  *Swartz*, 391 F. Supp. 3d at 209 (quoting *Pacheco v. Serendensky*, 393 F.3d 348, 352 (2d Cir. 2004)).  The petition, which is sworn and must be signed by the petitioner, must also "set forth the nature and circumstances of the petitioner's acquisition of the right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought."  § 853(n)(3).

### A.  The Government's Motion to Dismiss

The Government contends that Orienta's petition must be dismissed because it fails to:  (1) identify an interest in the Asset that is superior to the Goverment's own interest, which vested as early as 2002 when Swartz consummated the Grace Ventures transaction; (2) allege that Orienta is a bona fide purchaser for value without cause to believe the Asset was subject to forfeiture; and (3) establish standing for purposes of the 35 percent equity interest because Orienta does not allege a direct interest in the Asset.  Dkt. No. 248.

In opposition, Orienta argues that its petition adequately alleges that it is an innocent victim of Swartz's misconduct.  Dkt. No. 253.  Orienta claims that it conducted an arm's-length business transaction when it acquired its interest in the Asset and at the time

---

[4] Orienta filed a second petition in which it addressed claims made by other petitioners whose claims have since been dismissed.  Dkt. No. 83.

had no reason to know of Swartz's misdeeds.  Orienta acknowledges that its petition did not use certain words or phrases like "bona fide purchaser," but insists that liberal federal pleading standards do not require such strict adherence to form at this early stage of the proceedings.  Orienta also recounts how the Government initially withdrew its motion to dismiss and sought discovery into Orienta's claim, complaining at length that the Government's renewed request for dismissal is inequitable and prejudicial.

In reply, the Government reiterates its position that Orienta has failed to comply with the pleading requirements that apply in the forfeiture context.  Dkt. No. 255.  The Government also emphasizes that Orienta's alleged equity stake is in Focus Acquisitions, LLC, a holding company, not in the Asset itself.  According to the Government, this kind of indirect legal interest is insufficient to establish standing to contest forfeiture of the Asset.

Under Criminal Rule 32.2, "the court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason."  FED. R. CRIM. P. 32.2(c)(1).  "[A] motion to dismiss a third-party petition in a forfeiture proceeding prior to discovery or a hearing should be treated like a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)."  *Chowaiki*, 369 F. Supp. 3d at 572 (quoting *Pacheco*, 393 F.3d at 352).  "To survive a motion to dismiss, the petition need only state enough facts to state a claim to relief that is plausible on its face."  *Watts*, 786 F.3d at 161 (cleaned up).  "The factual allegations set forth in the petition are assumed to be true; the legal conclusions are not."  *Chowaiki*, 369 F. Supp. 3d at 572.

### 1. **Superior Interest under § 853(n)(6)(A)**

To prevail under § 853(n)(6)(A), a petitioner must establish, by a preponderance of the evidence, that:

> the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section.

21 U.S.C. § 853(n)(6)(A).

The Government argues that Orienta has not even pleaded a superior interest under this prong of the statute.  Gov't Mem., Dkt. No. 248 at 19.[5]  As the Government explains, Orienta's petition alleges two interests that vested on or after May 9, 2012, when Orienta bought out HCG's stake.  *Id*.  The Government notes that Orienta's prior opposition to the Government's now-withdrawn motion to dismiss argued, apparently in the alternative, that Orienta's interests may have vested as early as January 2009, the date on which HCG executed a deal with Swartz.[6]  *Id*. at 21.  In either case, the Government contends that those dates are well after the "acts which gave rise to the forfeiture of the property."  *Id*. at 19.

As an initial matter, Orienta's current opposition memorandum barely includes any argument at all in support of a claim under § 853(n)(6)(A)'s "superior title" prong.  *See generally* Orienta Opp'n, Dkt. No. 253.  The petition does include some conclusory language about interests that are "superior" to the Government's own, but the actual *facts* alleged in Orienta's operative petition would only support a claim based on interests acquired on or

---

[5]  Pagination corresponds to CM/ECF.

[6]  The Government correctly notes that this January 2009 vesting argument is not actually alleged in Orienta's petition.

after May 9, 2012.  Petition, Dkt. No. 43 ¶ 3.  In any event, whether measured from May 9, 2012 (as actually alleged in the petition) or from some time in January 2009 (as claimed in the earlier opposition), any claim asserted by Orienta based on § 853(n)(6)(A)'s "superior interest" prong fails as a matter of law.

"Subsection 853(n)(6)(A) works hand in hand with the 'relation-back' doctrine embodied in § 853(c), which provides that all property subject to forfeiture based on a criminal offense 'vests in the United States upon the commission of the [offense].'"  *Watts*, 786 F.3d at 166 (quoting 21 U.S.C. § 853(c)).  Thus, "[b]ecause forfeitable property vests in the government immediately upon the commission of a criminal act, a third party may prevail under § 853(n)(6)(A) only by establishing that he had a legal interest in the forfeited property *before* the underlying crime was committed—that is, before the government's interest vested."  *Id*. (cleaned up).

The definition of "proceeds" in the statute is also deliberately expansive, sweeping in all "property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  18 U.S.C. § 981(a)(2)(A).  As the Seventh Circuit has explained, "[t]he plain language of section 981(a)(1)(C) along with the expansive definition of 'proceeds' indicates that the statute contemplates the forfeiture of property other than the amounts alleged in the count(s) of conviction."  *United States v. Venturella*, 585 F.3d 1013, 1017 (7th Cir. 2009); *see also United States v. Lo*, 839 F.3d 777, 793 (9th Cir. 2016) ("The language of the forfeiture statute broadly makes forfeitable any property, obtained by the defendant directly or indirectly, as a result of the commission of a mail fraud or wire fraud offense.").

- 17 -

In *Swartz*, this Court concluded that "[v]arious admissions made by Swartz as part of his plea agreement conclusively establish that the 2002 formation of Grace Ventures and its subsequent acquisition of the Asset using money from other investors and a promissory note that [Swartz] later manipulated into a total write off were part and parcel of the wire fraud itself.  But for this fraudulent transfer to Grace Ventures, Swartz would not have obtained full control of the Asset at that time."  391 F. Supp. 3d at 212-13.  Because the Government's interest vested in 2002 when the Asset became proceeds of Swartz's fraudulent scheme, Orienta's claim of a "superior interest" based on transactions in 2009 and/or 2012.

Even assuming there was some lingering doubt about whether the Government's interest vested as a result of the fraudulent/sham Grace Ventures transaction in 2002, the relevant count of conviction and Swartz's accompanying admissions in his criminal case establish that his wire fraud scheme began by at least 2005.  *See* Gov't Mem. at 23; *see also* Gov't Reply, Dkt. No. 255 at 7 & n.2.

As the Government notes, "Swartz admitted that from in or about 2005 through in or about September 2015, he used promissory notes to obtain money and property from lenders and investors, [and] executed a scheme and plan to defraud lenders and investors in his food and restaurant franchises and concepts by means of false and fraudulent pretenses, representations, and promises."  Gov't Mem. at 9 (citing Dkt. No. 3 ¶ 5).

Ordinarily, consideration of this kind of extraneous evidence; *i.e.*, matters outside the pleadings, would be beyond the scope of a 12(b) motion to dismiss.  However, this is not just a motion to dismiss in an ordinary civil case.  The applicable forfeiture statute makes clear that, if necessary, a petitioner's claim to an interest in forfeitable property can proceed all the way through discovery and to an evidentiary hearing.  21 U.S.C. § 853(n)(5).  But as the

Second Circuit has observed, in the forfeiture context it would be absurd to require the Government "to reintroduce at a post-trial hearing potentially large portions of its case from the guilt phase of the defendant's trial to a judge or jury that has already seen and considered the relevant evidence." *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007).

To that end, the applicable forfeiture statute specifically directs the Court to consider the underlying criminal record.  21 U.S.C. § 853(n)(5) ("In addition to testimony and evidence presented at the hearing, the court shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture.").  Of course, if a review of that record gave rise to a genuine conflict with the facts alleged in a § 853(n) claimant's petition—for instance, if Orienta's petition had alleged that it acquired an interest in the Asset before the 2002 Grace Ventures transaction—then discovery and/or a hearing would be necessary.

However, Orienta's petition does not make the kind of allegations that would require further proceedings.  Instead, in its opposition Orienta claims to have alleged "superior title" by virtue of a constructive trust.  *See* Orienta Opp'n at 24.  But even assuming this constructive trust theory was sufficiently alleged in the operative petition, Orienta cannot show that any of its *own* funds (which came into play in 2012, or at best, in 2009 when HCG executed its own deal) are traceable to the 2002 or 2005 transactions.  *See* Gov't Reply, Dkt. No. 255, 8-11.

In sum, because the underlying record makes clear that the Asset became proceeds of Swartz's criminal scheme to defraud by at least 2005, Orienta's petition alleging a later-acquired interest—whether it vested in 2009 or 2012—necessarily fails*. See, e.g.*, *United States v. Eldick*, 223 F. App'x 837, 840 (11th Cir. 2007) ("In order to have a superior

interest [under § 853(n)(6)(A)] the claimant must have had a legal right, title, or interest in the

forfeitable properties that *preceded* the commission of the crime that gave rise to the

forfeiture of that property.").  Accordingly, Orienta has not plausibly alleged a superior

interest in the Asset under § 853(n)(6)(A).

### 2.  Bona Fide Purchaser under § 853(n)(6)(B)

To prevail under § 853(n)(6)(B), a petitioner must establish, by a preponderance of the

evidence, that:

> the petitioner is a bona fide purchaser for value of the right, title, or
> interest in the property and was at the time of purchase reasonably
> without cause to believe that the property was subject to forfeiture
> under this section.

21 U.S.C. § 853(n)(6)(B).

The Government argues that Orienta's petition fails to allege that it was a bona fide

purchaser for value without cause to believe the property was subject to forfeiture.  Gov't

Mem. at 24.  As the Government explains, Orienta's petition does not include any citation to

the § 853(n)(6)(B) prong of the statute or the kind of allegations that would support a claim

that it was a "bona fide purchaser."  *Id*. at 24-25.  In the alternative, the Government argues

that Orienta does not have standing to assert its 35 percent equity interest because it is

"merely a shareholder at least two corporate levels removed from any legal interest in the

Asset."  *Id*. at 26.

Orienta responds that its petition includes a more general citation to the relevant

forfeiture statute (*i.e.*, to 21 U.S.C. § 853) which, in Orienta's view, is sufficient for now to

plausibly allege its claim.  Orienta Opp'n at 19.  Orienta contends that it has stated a "bona

fide purchaser" claim under § 853(n)(6)(B) because "it alleges over and again and even

provides documentary evidence that it purchased an interest in the Asset for value, and that it had no reason to believe the Asset was connected to criminal activity." *Id*.  According to Orienta, the liberal pleading standard borrowed from the civil procedure context absolves it of any obligation to "cite the relevant statutory provision or [use] particular words to sufficiently allege a claim." *Id*. at 20.

Upon review, the Government has the better of this argument.  As an initial matter, Orienta fails to acknowledge the tension between Rule 12(b)'s general plausibility requirement and the "strict pleading requirements set forth in § 853(n)(3)." *Swartz*, 391 F. Supp. 3d at 213.  While it is true that a motion to dismiss a third-party petition is treated like a motion to dismiss a civil complaint under Rule 12(b), it does not necessarily follow that a § 853(n) petition's form or substance is governed by reference to the other rules of civil procedure, such as Rule 8(a)'s fairly lenient requirement that a pleading need only contain a "short and plain statement of the claim."

Instead, a § 853(n) petition is subject to the more detailed pleading obligations found in the forfeiture statute, which require a petitioner to "set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought."  21 U.S.C. § 853(n)(3).

These are "not simply technical requirements, but are construed strictly to discourage false or frivolous claims." *United States v. Ceballos–Lepe*, 977 F. Supp. 2d 1085, 1088 (D. Utah 2013); *see also United States v. Burge*, 829 F. Supp. 2d 664, 667 (C.D. Ill. 2011) ("Federal courts require strict compliance with the pleading requirements of § 853(n)(3), primarily because there is a substantial danger of false claims in forfeiture proceedings.").

A review of Orienta's petition shows that it repeatedly cites to the "superior interest" prong of the statute.  Petition, Dkt. No. 43 at 9, 11 (citing 21 U.S.C. § 853(n)(6)(A)).  And although Orienta does claim that it is a "victim of defendant Christopher Swartz['s] fraudulent conduct," *id*. at 9, its petition also discusses the "relation-back doctrine," a concept applicable only in the context of a "superior interest" claim under § 853(n)(6)(A), *id*. at 12.

In other words, Orienta's petition does not actually allege a distinct "bona fide purchaser" claim.  In reaching that conclusion, the Court rejects Orienta's assertion that merely claiming to be an "innocent victim" of Swartz's misconduct somehow satisfies the more specific requirement in § 853(n) that obligates a petitioner to allege it "was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section."  21 U.S.C. § 853(n)(6)(B).  After all, every third-party claimant seeking to recover against forfeitable property in a criminal proceeding is going to proclaim innocence and/or victimhood.  *Cf. United States v. Jimerson*, 5 F.3d 1453, 1455 (11th Cir. 1993) (holding that under § 853(n) "alleged innocence, standing alone, cannot defeat the Government's interest in criminally forfeited property").

To discourage false or frivolous claims to property subject to forfeiture, federal courts have repeatedly concluded that § 853(n) requires a petitioner to plead their claim with a reasonable degree of specificity.  For instance, courts have dismissed a claimant's petition for failure to specify whether the claim was grounded in the "superior interest" prong of § 853(n)(6)(A) or the "bona fide purchaser" prong of § 853(n)(6)(B).  *United States v. Salkey*, 2016 WL 3766308, at *3 (E.D. Va. July 11, 2016) ("The instant amended petition does not identify under which ground of 21 U.S.C. § 853(n)(6) relief is sought and fails to satisfy the bulk of the remaining pleading requirements set forth in 21 U.S.C. § 853(n)(3).").

As relevant here, courts have also refused to consider both prongs of § 853(n)(6) when a claimant's petition only referenced one prong or the other. *United States v. Espada*, 128 F. Supp. 3d 555, 561 n.4 (E.D.N.Y. 2015) (declining to consider "bona fide purchaser" claim where petition alleged only a "superior interest" claim); *see also United States v. Soreide*, 461 F.3d 1351, 1355 (11th Cir. 2006) (denying relief to a claimant who alleged a "bona fide purchaser" claim in the § 853(n) petition but attempted to assert a "superior interest" claim in subsequent ancillary proceedings); *United States v. Watson*, 549 F. Supp. 2d 961, 964 (W.D. Mich. 2008) ("Contrary to [claimant's] contention, [the] verified petition does not assert that [claimant] is a ["bona fide purchaser"] or reference 21 U.S.C. § 853(n)(6)(B).").

Further, unlike an ordinary civil proceeding in which amendments to pleadings are generally freely given, FED. R. CIV. P. 15(a)(2), the 30-day time period in which to file a third-party petition under § 853(n)(2) is ordinarily strictly construed. *United States v. Lamid*, 663 F. App'x 319, 325 (5th Cir. 2016) (per curiam) (affirming trial court's denial of leave to amend a § 853(n) petition); *United States v. Strube*, 58 F. Supp. 2d 576, 585 (M.D. Pa. 1999) (rejecting petitioner's theory of a constructive trust because it was not asserted in the 30-day window set forth in § 853(n)(2)).  In short, the petition does not allege a "bona fide purchaser" claim under § 853(n)(6)(B).[7]

---

[7]  Even if the Court were inclined to consider Orienta's "bona fide purchaser" claim, the 35 percent equity ownership component of its claim would be subject to dismissal because Orienta, by its own admission, "is merely a shareholder at least two corporate levels removed from any legal interest in the Asset."  Gov't Mem. at 26.

## V. **CONCLUSION**

Because of the substantial danger of false or frivolous claims in forfeiture proceedings, the relevant statute obligates petitioners to lay their cards on the table early in the claim process by, *inter alia*, following the pleading standard of § 853(n)(3) and by being reasonably specific about the type of relief sought. A claimant cannot resort to Rule 12(b) case law to get around this statutory requirement. Orienta—in a counseled filing—chose not to allege a "bona fide purchaser" claim. Instead, Orienta chose to plead only a "superior interest" claim, a conscious decision evidenced by Orienta's repeated, specific references to § 853(n)(6)(A).

Therefore, it is

ORDERED that

1.  The Government's motion to dismiss is GRANTED; and

2.  The Clerk of the Court is directed to terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: January 7, 2021
       Utica, New York.

          United States District Judge